# 17-1859

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

KAREEM BELLAMY,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, JOHN J. GILLEN, AND MICHAEL F. SOLOMENO,

*Defendants-Appellees,*

JOHN DOE 1, JOHN DOE 2, SUPERVISING OFFICERS AT THE NYPD 101ST PRECINCT, VINCENT NMI PEPE, AND ROBERT SCHRUHL,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of New York, No. 1:12-cv-01025-AMD-PK
Before the Honorable Ann Donnelly

## BRIEF FOR AMICI CURIAE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK STATE ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, INNOCENCE NETWORK, AND INNOCENCE PROJECT IN SUPPORT OF APPELLANT AND REVERSAL

RICHARD D. WILLSTATTER
VICE CHAIR, AMICUS CURIAE
  COMMITTEE OF THE NATIONAL
  ASSOCIATION OF CRIMINAL
  DEFENSE LAWYERS
CHAIR, AMICUS CURIAE COMMITTEE
  OF THE NEW YORK STATE
  ASSOCIATION OF CRIMINAL
  DEFENSE LAWYERS
200 Mamaroneck Avenue, Suite 605
White Plains, NY 10601
(914) 948-5656

ADELE BERNHARD
INNOCENCE NETWORK
185 West Broadway
New York, NY 10013
(212) 431-2813

BARRY SCHECK
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY 10013
(212) 364-5340

ROSS E. FIRSENBAUM
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Amici Curiae
National Association of
Criminal Defense Lawyers,
New York State Association of
Criminal Defense Lawyers,
Innocence Network, and
Innocence Project*

October 2, 2017

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* are not owned by a parent corporation.  No publicly held corporation owns more than ten percent of stock in *amici*.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMEN...........................................................i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICI CURIAE...........................................................1

INTRODUCTION .................................................................................3

ARGUMENT ....................................................................................8

I.    THE DISTRICT COURT'S DECISION UNFAIRLY DEPRIVES WRONGFULLY CONVICTED INDIVIDUALS OF THE OPPORTUNITY TO PURSUE MUCH-NEEDED COMPENSATION AND IMPROPERLY IMMUNIZES MUNICIPALITIES FOR DISTRICT ATTORNEYS' MISCONDUCT ....................................................................................8

    A.    The Law Should Provide Adequate Remedies To Wrongfully Convicted Individuals........................................................8

    B.    Wrongfully Convicted Individuals Face Many Hurdles To Obtaining Much-Needed Financial Recovery .................................9

    C.    The Law Should Provide Powerful Incentives To Municipalities To Ensure That Policymakers Manage Their Offices In A Way That Reduces The Likelihood Of Wrongful Convictions .........................................................15

    D.    Municipal Liability Promotes Other Goals That Benefit Our Criminal Justice System.................................................20

    E.    If Upheld, The District Court's Decision Would All But Eliminate The Last Viable Incentives For DAs To Adopt Local Policies In Accordance With The Constitution ........................21

II.   THE DISTRICT COURT'S DECISION IGNORES NEW YORK STATE POLICY TO DETER MUNICIPALITIES FROM VIOLATING CRIMINAL DEFENDANTS' CONSTITUTIONAL RIGHTS ........................................25

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alden v. Maine*, 527 U.S. 706 (1999) ....................................................11

*Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988)....................................27

*Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997)..............................................................................13

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)....................................21

*Brady v. Maryland*, 373 U.S. 83 (1963) ...........................................3, 4

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .........................................13

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) ...............20

*Claude H. v. County of Oneida*, 626 N.Y.S.2d 933 (App. Div. 1995)...................28

*Connick v. Thompson*, 563 U.S. 51 (2011) ....................................14, 23

*Fonfa v. State*, 388 N.Y.S.2d 65 (Ct. Cl. 1976).....................................28

*Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) .........................27

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................18

*Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013)..............29

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) .....................................17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .........................................13

*Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907)...............................25

*Hutto v. Finney*, 437 U.S. 678 (1978)..................................................29

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ...........................................15

*Johnson v. Kings County District Attorney's Office*, 763 N.Y.S.2d 635 (App. Div. 2003)......................................................................................28

*Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979)......................................................................................29

*McMillian v. Monroe County*, 520 U.S. 781 (1997)......................................6, 25, 26

*Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)......................................................................................13

*Morris v. City of New York*, 603 N.Y.S.2d 463 (App. Div. 1993) ........................28

*Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998)...............................*passim*

*Owen v. City of Independence*, 445 U.S. 622 (1980) ..................................8, 20, 29

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ............................................26

*People v. Anderson*, 921 N.Y.S.2d 156 (App. Div. 2011)......................................16

*People v. Cole*, 765 N.Y.S.2d 477 (Sup. Ct. 2003) ................................................10

*People v. Gaines*, 604 N.Y.S.2d 272 (App. Div. 1993)..........................................18

*People v. Jackson*, 585 N.E.2d 795 (N.Y. 1991) ...................................................10

*People v. Session*, 313 N.E.2d 728 (N.Y. 1974).....................................................10

*People v. Steadman*, 623 N.E.2d 509 (N.Y. 1993)..........................................17, 23

*Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995) .....................................27

*Ramos v. City of New York*, 729 N.Y.S.2d 678 (App. Div. 2001)..........................28

*Reed v. State*, 574 N.E.2d 433 (N.Y. 1991) ..........................................................12

*Su v. Filion*, 335 F.3d 119 (2d Cir. 2003)...................................................18, 19, 23

*Tunia v. State*, 434 N.Y.S.2d 846 (Ct. Cl. 1978) ..................................................28

*Turner v. Schriver*, 327 F. Supp. 2d 174 (E.D.N.Y. 2004)......................................10

*Turner v. State*, 825 N.Y.S.2d 904 (Ct. Cl. 2006) ...................................................11

*United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013)..............................................16

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ...........................................22

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009).....................................4, 12, 23, 29

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992).......................7, 13, 15, 26

*Warney v. State*, 947 N.E.2d 639 (N.Y. 2011) ........................................................12

*Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) ..........................11

## DOCKETED CASES

*Bozella v. County of Dutchess*, No. 10-4917 (S.D.N.Y.) .........................................22

*People v. Bedi*, No. 4107/96, NYLJ 1202592836531 (N.Y. Sup. Ct.
    Queens Cty. Mar. 13, 2013) ...........................................................................18

## STATUTES AND RULES

42 U.S.C. § 1983 ...................................................................................*passim*

New York Court of Claims Act § 8–b ......................................................................11

Fed. R. App. P. 29 ......................................................................................................1

N.Y. Crim. Proc. L. § 440.10 ...................................................................................10

## OTHER AUTHORITIES

Assembly Bill No. 3894 (N.Y. Jan. 30, 2017), *available at*
    http://www.assembly.state.ny.us/leg/?default_fld=&leg_
    video=&bn=A03894&term=2017&Summary=Y&Text=Y ..........................9

Cytryn, Steven M., *Guilty Until Proven Innocent: Providing Effective Relief to the Actually Innocent in New York*, 10 Cardozo Pub. L., Pol'y & Ethics J. 469 (2012)...................................................................10

Innocence Project, *Making Up for Lost Time: What the Wrongfully Convicted Endure and How to Provide Fair Compensation* (2009), https://www.innocenceproject.org/wp-content/uploads/2016/06/innocence_project_compensation_report-6.pdf..........................8, 9

Keenan, David, et al., *Myth of Prosecutorial Accountability after* Connick v. Thompson: *Why Existing Professional Responsibility Measures Cannot Protect against Prosecutorial Misconduct*, 121 Yale. L.J. Online 203 (2011) .......................................14, 23

Letter from John M. Ryan, Chief Assistant District Attorney, Queens County, to Joaquin Sapien, ProPublica (Sept. 14, 2012), *available at* https://www.propublica.org/documents/item/654080-pro-publica-response-qda-09-14-12-2...............................................22

The National Registry of Exonerations, *Exonerations in 2016* (2017), https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf.......................................................15, 16

New York State Bar Ass'n, *Final Report of the Task Force on Wrongful Convictions* (Apr. 4, 2009), https://www.nysba.org/wcreport/ ...................................................................17

New York State Bar Ass'n, *Report of the Task Force on Criminal Discovery* (Jan. 30, 2015), https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=54572 ............................................17, 23

New York State Justice Task Force, *Report on Attorney Responsibility in Criminal Cases* (Feb. 2017), http://www.nyjusticetaskforce.com/pdfs/2017JTF-AttorneyDisciplineReport.pdf ..............................17

New York City Bar, *Undoing Time: A Proposal for Compensation for Wrongful Imprisonment of Innocent Individuals* (2010), http://www.nycbar.org/pdf/report/uploads/20072010-UndoingTimeAProposalforCompensationforWrongfulImprisonment.pdf ........................9, 12

Ridolfi, Kathleen, et al., National Ass'n of Criminal Defense Lawyers, *Material Indifference: How Courts Are Impeding Fair Disclosure In Criminal Cases* (2014), https://www.nacdl.org/ discoveryreform/materialindifference/ ..........................................................22

Rudin, Joel B., *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537 (2011)..............................................................................................19, 22, 24

Sapien, Joaquin, *New York City Will Pay $10 Million to Settle Wrongful Conviction Case*, ProPublica, Aug. 19, 2014, https:// www.propublica.org/article/new-york-city-will-pay-10-million- to-settle-wrongful-conviction-case................................................................21

Secret, Mosi, *Lawsuit Against Prosecutor to Proceed*, N.Y. Times, Feb. 15, 2013, http://www.nytimes.com/2013/02/16/nyregion/ lawsuit-against-charles-j-hynes-brooklyn-district-attorney-is- allowed-to-proceed.html................................................................................20

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

The New York State Association of Criminal Defense Lawyers ("NYSACDL") is a not-for-profit corporation with a subscribed membership of more than 800 attorneys, including private practitioners, public defenders, and law professors, and is the largest private criminal bar in the State of New York. It is a

---

[1]     Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part, and that no party or person other than *amici* or their counsel contributed money towards the preparation or filing of this brief.

recognized state affiliate of the NACDL and, like that organization, works on behalf of the criminal defense bar to ensure justice and due process for those accused and convicted of crimes.

The Innocence Network (the "Network") is an association of organizations dedicated to providing pro bono legal and/or investigative services to prisoners for whom evidence discovered post-conviction can provide conclusive proof of innocence. The 65 current members of the Network represent hundreds of prisoners with innocence claims in all 50 states and the District of Columbia, as well as Canada, the United Kingdom, and Australia. The Network and its members are also dedicated to improving the accuracy and reliability of the criminal justice system in future cases. Drawing on the lessons from cases in which innocent persons were convicted, the Network advocates study and reform designed to enhance the truth-seeking function of the criminal justice system to ensure that future wrongful convictions are prevented.

The Innocence Project, Inc. (the "Project") is a national legal services and criminal justice reform organization based in New York. Founded in 1992 by Barry Scheck and Peter Neufeld at Cardozo Law School, the Project's attorneys pioneered the litigation model that has, to date, led to the exoneration of 349 wrongly convicted persons in the United States through post-conviction DNA testing. The Project's attorneys have served as lead or co-counsel for nearly half of

those exonerated individuals nationwide.  The Project regularly consults with judges, prosecutors, and legislators regarding the causes of wrongful convictions and how to prevent them.  The Project has also taken a leading role in addressing wrongful convictions caused by prosecutorial misconduct, focusing on how the justice system can ensure both accountability and deterrence.

NACDL, NYSACDL, the Network, and the Project (collectively, "Amici"), and their members and clients have an interest in ensuring that municipalities, through their policymakers (specifically, district attorneys ("DAs")) implement policies and practices that comport with *Brady v. Maryland*, 373 U.S. 83 (1963), and train and discipline prosecutors who deprive criminal defendants of fair trials. Affording wrongfully convicted individuals a cause of action under 42 U.S.C. § 1983 against municipalities when municipalities have implemented constitutionally deficient policies and practices that cause wrongful convictions is critical to ensuring that municipalities take appropriate steps to ensure fair trials and protect the innocent.

The parties to this appeal have consented to the filing of this brief.

## INTRODUCTION

Amici write to address the District Court's pleadings-stage dismissal of Kareem Bellamy's *Monell* claims against New York City.  As explained in Bellamy's merits brief, the District Court's ruling is contrary to controlling Second

Circuit authority holding that where, as here, a plaintiff alleges that a municipal policymaker (*i.e.*, the DA) adopts an administrative policy or practice that prevents the disclosure of favorable evidence under *Brady v. Maryland* and that such practice causes a *Brady* violation in the plaintiff's criminal case, the plaintiff has a valid claim against the municipality under 42 U.S.C. § 1983. Appellant Br. 46-52. The same reasoning applies to a claim, as here, where the DA fails to adequately train and discipline prosecutors after numerous prior instances of known misconduct during summations and that failure causes the same summation misconduct in the plaintiff's case, depriving him of a fair criminal trial. *See id.* The District Court ignored this controlling authority, instead misapplying the Supreme Court's decision in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), a decision that addresses an entirely different legal question not present here—immunity for claims against *individuals*—and committed reversible legal error in doing so.

Amici urge reversal of the District Court's ruling not only because it contravenes controlling precedent, but also because it advances bad public policy and ignores New York State's policy decision to hold its municipalities liable for the type of DA misconduct at issue here.

*First*, if adopted by this Court, the District Court's decision would unfairly deprive wrongfully convicted individuals of the opportunity to seek compensation

from the municipalities that harmed them. The law should afford such plaintiffs an opportunity to pursue compensation for the years (often decades) that they have lost behind bars because of convictions secured in violation of their constitutional rights. There are already many hurdles to obtaining financial recovery, even after an individual has satisfied the demanding burden of proving that he was wrongfully convicted. Plaintiffs whose constitutional rights were violated by prosecutors (in contrast to police) face additional obstacles to receiving compensation. This Court should not permit to stand a ruling that would further limit wrongfully convicted plaintiffs' opportunities to seek redress.

Moreover, the law should provide incentives to municipalities to ensure that their policymakers manage their offices in a way that reduces the likelihood of wrongful convictions. Municipal liability helps ensure accountability when municipal policymakers implement policies and practices that violate criminal defendants' constitutional rights, and fail to train and discipline prosecutors when there is a known need to do so. By ignoring this Court's precedent, the District Court's ruling immunizes municipalities for their misdeeds and encourages DAs to implement "win at all cost" policies and practices without regard to criminal defendants' constitutional rights.

*Second*, basic federalism principles require reversal. The Supreme Court has made clear that whether a municipality is liable under § 1983 for its policies and

practices that cause constitutional torts "is dependent on an analysis of state law." *McMillian v. Monroe Cty.*, 520 U.S. 781, 786 (1997). That is because states make their own policy decisions about how to organize themselves and whether and to what extent their municipalities should be held accountable for certain conduct of local policymakers that causes wrongful convictions. New York State has made the policy decision to create political subdivisions (*e.g.*, counties and municipalities), and to hold those subdivisions liable for the decisions and actions of DAs when they make policy in their local official capacities. The District Court takes no notice of New York's policy determination, entirely ignoring the only two New York state appellate court decisions that have ruled on the issue presented here, both of which (along with this Court's own precedent interpreting New York law) hold that a valid claim exists against a New York municipality based on allegations such as those in the Complaint.

At bottom, this is the rare case where a wrongfully convicted plaintiff has alleged that, (i) despite the New York Court of Appeals' conclusion *prior to his murder conviction* that the "Chinese Wall" policy of the Queens County District Attorney's Office (the "QCDAO") was unconstitutional, the QCDAO nevertheless followed that policy years later in his criminal case, and a *Brady* violation resulting from that policy caused his wrongful conviction; and (ii) despite at least *65 decisions prior to his murder conviction* in which New York state appellate courts

concluded that QCDAO prosecutors had deprived criminal defendants of a fair trial by engaging in summation misconduct, the Queens County District Attorney (the "QCDA") did not discipline or institute further training after those decisions, notwithstanding an obvious need to do so, and the trial prosecutor in his criminal case deprived him of a fair trial by engaging in similar summation misconduct. Under controlling precedent, these well-pled allegations of the systemic, policy-driven violations of Bellamy's civil rights are sufficient to state a claim and entitle him to pursue further discovery.[2]  This Court should reverse, reaffirm its holdings in *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), and *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and make clear that wrongfully convicted individuals continue to have a valid cause of action against a New York municipality where they can show that their wrongful convictions resulted from such unconstitutional policies and practices by a DA or other local policymaker.

---

[2]  Indeed, the limited discovery provided to Bellamy on his fair trial claims provides further evidentiary support for his *Monell* claim that the City had an unconstitutional policy that caused a *Brady* violation in his case. *See, e.g.*, A-1229-1230, 1385, 1399-1406, 1513-1515, 3308-3314, 3318-3319, 3348, 3430-3446, 3459-3461 (admissions of witness Linda Sanchez (a crucial government witness) and QCDAO personnel that the QCDAO promised Sanchez benefits before she testified at trial and that the QCDAO had a "Chinese Wall" policy shielding trial prosecutors from learning about witness benefits).  The Appendix to Appellant's Brief is cited as "A-" by page.

# ARGUMENT

**I. THE DISTRICT COURT'S DECISION UNFAIRLY DEPRIVES WRONGFULLY CONVICTED INDIVIDUALS OF THE OPPORTUNITY TO PURSUE MUCH-NEEDED COMPENSATION AND IMPROPERLY IMMUNIZES MUNICIPALITIES FOR DISTRICT ATTORNEYS' MISCONDUCT**

The District Court's decision fails to provide a remedy for individuals who are wrongfully convicted as a result of unconstitutional municipal policies and practices. The decision also fails to incentivize municipal policymakers to take administrative steps that reduce the likelihood of wrongful convictions.

## A. The Law Should Provide Adequate Remedies To Wrongfully Convicted Individuals

The Supreme Court has noted the importance of a cause of action for municipal liability:

> A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

*Owen v. City of Independence*, 445 U.S. 622, 651 (1980). The cause of action is even more critical for wrongfully convicted and imprisoned individuals such as Bellamy. Exonerees have lost their homes, jobs, and sometimes family and friends while imprisoned, and they often lack a source of income, a means of transportation, health coverage, and a stable home when they are released.[3] Yet

---

[3] Innocence Project, *Making Up for Lost Time: What the Wrongfully Convicted Endure and How to Provide Fair Compensation* 3 (2009), https://www.

- 8 -

there are few (if any) resources available to exonerees when they are released from prison.  Indeed, research shows that parolees (who, unlike exonerees, are presumed to be lawfully convicted and guilty) have greater access to financial and other resources than exonerees.[4]  Thus, perhaps more than any other class of civil plaintiff, wrongfully convicted plaintiffs rely on civil remedies to support their re-entry into a free society.

**B.  Wrongfully Convicted Individuals Face Many Hurdles To Obtaining Much-Needed Financial Recovery**

Despite a compelling need to provide a legal remedy to the wrongfully convicted, the District Court's decision threatens to gut one of the last remaining avenues for vindicating and fairly compensating those who have been wronged by our criminal justice system (and, in particular, by DAs' offices) and must now rebuild their lives.  It is already exceedingly difficult for a wrongfully convicted plaintiff to recover under § 1983.

---

innocenceproject.org/wp-content/uploads/2016/06/innocence_project_compensation_report-6.pdf.

[4]     *See id.* at 10; N.Y.C. Bar, *Undoing Time: A Proposal for Compensation for Wrongful Imprisonment of Innocent Individuals* 5 (2010), http://www.nycbar.org/pdf/report/uploads/20072010-UndoingTimeAProposal forCompensationforWrongfulImprisonment.pdf; *see also* Assemb. B. 3894 (N.Y. 2017) (pending proposal to make exonerees eligible for benefits available to parolees), *available at* http://www.assembly.state.ny.us/leg/?default_fld=&leg_ video=&bn=A03894&term=2017&Summary=Y&Text=Y.

*First*, it is immensely difficult for a convicted defendant in New York to prove a wrongful conviction in the first place. *See People v. Session*, 313 N.E.2d 728, 729 (N.Y. 1974) ("A judgment of conviction is presumed valid[.]"); Cytryn, *Guilty Until Proven Innocent: Providing Effective Relief to the Actually Innocent in New York*, 10 Cardozo Pub. L., Pol'y & Ethics J. 469, 476-490 (2012) (discussing high burdens and barriers to relief under N.Y. Crim. Proc. L. § 440.10). For example, where a defendant's claim is based on actual innocence, the defendant must meet the demanding standard of proving by "clear and convincing evidence" that he or she is innocent. *See People v. Cole*, 765 N.Y.S.2d 477, 486 (Sup. Ct. 2003). Those seeking relief without the benefit of exculpatory DNA evidence face additional obstacles. *See, e.g.*, *Turner v. Schriver*, 327 F. Supp. 2d 174, 180, 185-187 (E.D.N.Y. 2004) (granting habeas relief in case involving *Brady* violation and admission of perjured testimony after state courts had denied 440 motion without hearing and dismissed central witness' recantation as "serv[ing only] to enhance the inherently suspect nature of recantations generally"); *People v. Jackson*, 585 N.E.2d 795, 802-803 (N.Y. 1991) (Titone, J., dissenting) (arguing that the court's decision, which requires that defendants seeking to vacate judgment based on failure to disclose *Rosario* evidence "show that actual, ascertainable prejudice resulted," will "make relief for *Rosario* violations virtually unavailable in postconviction proceedings").

*Second*, even where an individual has met the exacting burden of proving a wrongful conviction, there are numerous obstacles to obtaining compensation:

States are generally immune from suit. *See Alden v. Maine*, 527 U.S. 706, 715 (1999) (states are immune from private suits unless they consent to liability); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (a state is not a proper defendant in a § 1983 action). The New York Legislature has carved out a narrow exception to state immunity in § 8–b of the Court of Claims Act, but individuals seeking compensation under this section carry the "substantial burden" of proving by "clear and convincing" evidence that, after being incarcerated for a state crime, they have been pardoned upon the ground of innocence or their judgment of conviction reversed or vacated, and the accusatory instrument dismissed, on certain enumerated grounds, that they are innocent, and that they did not by their own conduct cause the conviction. Court of Claims Act § 8–b(1), (5).[5] Notably omitted from possible recovery are wrongful convictions obtained in violation of a defendant's constitutional rights. *Turner v. State*, 825 N.Y.S.2d 904, 907 (Ct. Cl. 2006) (constitutional violations are not comprehended by § 8–b), *aff'd*, 854 N.Y.2d 778 (App. Div. 2008).

---

[5]     Despite these hurdles, Bellamy has prevailed in a separate action against New York State. *See* Appellant Br. 6 n.2.

A claimant attempting to assert damages under § 8–b faces a daunting task—such actions "[are] not expected to succeed frequently." *Reed v. State*, 574 N.E.2d 433, 437 (N.Y. 1991); *see also Warney v. State*, 947 N.E.2d 639, 643 (N.Y. 2011) (§ 8–b imposes a higher pleading standard than the New York Civil Practice Law and Rules, requiring that allegations be sufficiently detailed to demonstrate likelihood of success at trial); *Reed*, 574 N.E.2d at 437 (in enacting § 8–b, the State anticipated that most claims would not survive a motion to dismiss); *id.* ("putting the burden of proof on claimant places one in a difficult position of proving a negative" (quotation marks omitted)). Indeed, according to a 2010 report by the New York City Bar Association, of the more than 200 wrongful conviction claims heard by the New York Court of Claims since the 1990s, there were over 150 dismissals, 19 out-of-court settlements, and only 12 actual awards. N.Y.C. Bar, *Undoing Time*, *supra*, at 41.

Individual prosecutors and their supervisors also are immune from suit in virtually all cases. *Van de Kamp v. Goldstein*, 555 U.S. 335, 341-342 (2009) (prosecutors and their supervisors enjoy absolute immunity from claims against them as individuals when they act as '"officer[s] of the court"'). Absolute immunity does not apply in the rare circumstance where a prosecutor acts in an "investigative" capacity rather than as advocate and the plaintiff can show that this non-advocacy conduct caused his or her wrongful conviction, but even then the

prosecutor still receives qualified immunity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), shielding him or her from personal liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

While municipalities are not immune from liability, they are not liable for prosecutors' actions under a theory of *respondeat superior*. *See Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, an isolated act of misconduct by a trial prosecutor—even where the misconduct was both egregious and intentional—will not give rise to municipal liability. Rather, a plaintiff must demonstrate a direct causal link between a municipal action, policy, custom, or practice and the prosecution's deprivation of the plaintiff's federal rights. *See Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997).

In New York, § 1983 claims against a municipality arising from prosecutorial misconduct are further limited: they must be based on an administrative function of the DA, *i.e.*, the municipal policymaker, rather than a prosecutorial function, *i.e.*, the decision to indict. *See Myers v. County of Orange*, 157 F.3d 66, 77 (2d Cir. 1998); *see also Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992). In other words, recovery must be based on the DA's implementation of an unlawful policy, practice, or custom, or failure to train, supervise or discipline trial prosecutors. *See Myers*, 157 F.3d at 77.

*Finally*, recovery under § 1983 is even more constrained when the underlying municipal action is based on the municipal policymaker's failure to train assistant district attorneys ("ADAs"). *See Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must meet a "'stringent standard of fault'" by proving that the municipal policymaker was on notice that, absent additional specified training, it was "highly predictable" that constitutional violations would continue to occur, and the policymaker disregarded those consequences. *Id.* at 70-71. A plaintiff must therefore obtain evidence of *similar* violations from *other* criminal cases that occurred *before* the violations in his own criminal case, which may have occurred, as here, decades ago. *See id.* at 62-63. This hurdle is made even more extreme in cases involving *Brady*, since most *known* instances of *Brady* violations are the result of "'chance discover[ies]'" made during the course of drawn-out trial or appellate proceedings. Keenan et al., *Myth of Prosecutorial Accountability after Connick*, 121 Yale. L.J. Online 203, 210 (2011) (citing *Connick*, 563 U.S. at 79 (Ginsburg, J., dissenting)).[6]

---

[6] Bellamy's case illustrates the point. The full extent of the *Brady* violation at issue here was not exposed until after Bellamy's criminal trial and 440 proceedings. *See* A-1957-1962 ¶¶ 238-251, 253-254; A-1963, 1967-1968 ¶¶ 261, 290. The substantial benefits promised to witness Sanchez were partially disclosed during the 440 proceedings, but Bellamy did not discover the crucial fact that those benefits were promised her *before* she testified until civil discovery on the individual claims in this case. *See* A-1956-1957 ¶¶ 226-237. Although the District Court dismissed Bellamy's *Monell* claims at the pleadings stage, it decided one element of the those claims—namely, whether there was a constitutional violation

Consistent with these limitations on individual and municipal liability, this Court has, applying New York State law, held for decades that a narrow, but important, path exists for a wrongfully convicted plaintiff to obtain redress from a New York municipality based on a DA's misconduct. *See Myers*, 157 F.3d at 77; *Walker*, 974 F.2d at 301. With this path available for decades, the floodgates of frivolous lawsuits have not opened. And there is no evidence that lawyers in New York have declined to pursue careers as line prosecutors (the policy rationale for immunizing individual prosecutors, *see Imbler v. Pachtman*, 424 U.S. 409, 424-426 (1976)), or run for the elected position of DA, because of this potential municipal liability. There is simply no reason to disturb the status quo set forth in this Court's prior decisions in *Walker* and *Myers*.

**C.    The Law Should Provide Powerful Incentives To Municipalities To Ensure That Policymakers Manage Their Offices In A Way That Reduces The Likelihood Of Wrongful Convictions**

Wrongful convictions are a widespread problem, including in New York. *See* The Nat'l Registry of Exonerations, *Exonerations in 2016*, at 3 (2017) (2016 was another record-breaking year for exonerations in the United States, adding 166 exonerations for a total of 1,994 recorded exonerations since 1989), https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf; *id.* at 5

---

in Bellamy's criminal case—on summary judgment. Therefore, the record on that issue is not limited to the pleadings.

(New York was state with third highest number of known exonerations in 2016).

Many wrongful convictions involve *Brady* violations. *See id.* at 2 (70 of the 166 known exonerations in 2016 involved official misconduct, and the most common misconduct documented is the concealing of exculpatory evidence). Improper summations also regularly contribute to wrongful convictions. *See, e.g.*, *People v. Anderson*, 921 N.Y.S.2d 156, 158 (App. Div. 2011) (reversing conviction where prosecutor's persistent summation misconduct, which included vouching for witnesses' credibility, suggesting defendant was lying, and mischaracterizing defendant's testimony to make inflammatory arguments, "exceeded the bounds of permissible advocacy and improperly denigrated the defense").

The law must hold prosecutors' offices accountable for misconduct that destroys lives. Lack of accountability "creates a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice" and "send[s] a clear signal to prosecutors that, [particularly] when a case is close, it's best to hide evidence helpful to the defense." *United States v. Olsen*, 737 F.3d 625, 630 (9th Cir. 2013) (Kozinski, J., dissenting).

Municipal liability provides a much-needed incentive for municipalities to hold their policymakers accountable. That accountability can push DAs to adopt policies and practices that promote fair trials and implement training and disciplinary policies that reduce the likelihood of repeat mistakes and misconduct

resulting in wrongful convictions. *See* N.Y. State Bar Ass'n, *Report of the Task Force on Criminal Discovery* 63 (2015) ("[S]tudies attribute the intentional disregard of *Brady* to office culture and a failure by prosecution supervisors to create an attitude of respect for the rule."), https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=54572; N.Y. State Bar Ass'n, *Final Report of the Task Force on Wrongful Convictions* 31 (2009) (recommending that prosecutors' offices establish effective procedures for preventing, identifying, and sanctioning misconduct, including dismissal from employment as appropriate, when a state or federal court has concluded that an ADA has violated the rules), https://www.nysba.org/wcreport/; N.Y. State Justice Task Force, *Report on Attorney Responsibility in Criminal Cases* 6-7 (2017) (making recommendations for training on ethical obligations and discussing the need to create a "culture of disclosure"), http://www.nyjusticetaskforce.com/pdfs/2017JTF-AttorneyDisciplineReport.pdf.

The allegations in the Complaint regarding the QCDAO, which must be taken as true on a motion for judgment on the pleadings, *see Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001), make crystal clear the need for accountability in that office. In 1993, two years *before* Bellamy's criminal trial, the New York Court of Appeals held that the QCDAO's scheme, which "shield[ed]" trial assistants from knowledge of benefits agreements made with witnesses, "undermine[d] the purposes of [] *Brady*." *See People v. Steadman*, 623 N.E.2d 509, 511-512 (N.Y.

1993) (ordering new trial); *see also People v. Gaines*, 604 N.Y.S.2d 272, 273

(App. Div. 1993) (same); A-53 ¶¶ 114-115; A-89-90 ¶¶ 364-365.  Yet the QCDAO

apparently went undeterred and continued to implement that policy or practice in

Bellamy's criminal case two years later.  A-51-53 ¶¶ 102-103, 113-115.[7]  It was

only over a decade later, through numerous FOIL requests, that Bellamy's 440

counsel discovered that as a result of this policy a *Brady* violation occurred—the

QCDAO had suppressed benefits received by witness Sanchez for her testimony,

A-50-51 ¶¶ 91-100 (evidence that is classic *Brady* material, *see, e.g.*, *Giglio v.*

*United States*, 405 U.S. 150, 154-155 (1972) (jury is entitled to know of evidence

of any understanding or agreement between prosecutor and witness); *Su v. Filion*,

335 F.3d 119, 129 (2d Cir. 2003) (additional evidence regarding prosecution

witness' plea deal with QCDAO prosecutors was material to assessing witness'

credibility)).

     Similarly, between 1985 and 1995 (the year of Bellamy's trial), there were at

least 65 instances in which New York appellate courts held that prosecutorial

misconduct by the QCDAO during summations deprived defendants of their

---

[7]    Indeed, even five years after Bellamy's trial and seven years after *Steadman*, this unlawful policy was still in effect.  *See People v. Bedi*, No. 4107/96, NYLJ 1202592836531, at \*26, \*38, (N.Y. Sup. Ct. Queens Cty. Mar. 13, 2013) (QCDAO policy of not including the Witness Security file with the litigation file prevented defense from impeaching prosecution witness regarding approximately $20,000 in payments received in exchange for testimony in trial in 2000).

constitutional rights to a fair trial.  A-90-91 ¶ 370.  But the QCDA, the municipal

policymaker, did not discipline any of the prosecutors in his office for such

misconduct at any time prior to Bellamy's criminal trial.  A-90-91 ¶¶ 367, 372.

And the trial prosecutor in Bellamy's case committed the same legal error during

his summation, *see* A-80-84 ¶¶ 317-327, 329-333, depriving Bellamy of a fair trial.

Thus, this is the rare and exceptional case involving *two* unconstitutional

administrative policies or practices, and deliberate indifference to criminal

defendants' constitutional rights, that has persisted for many years—the kind of

municipal policymaker indifference that states a *Monell* claim.  The Complaint's

allegations are well supported by evidence that is already publicly available.  *See,*

*e.g.*, *Su*, 335 F.3d at 127, 130 (granting habeas relief where a Queens trial

prosecutor in 1992 suppressed evidence of a plea deal made with a cooperating

witness and bolstered the witness' false testimony that he was not promised

anything in exchange for his testimony in closing arguments); Rudin, *The Supreme*

*Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the*

*Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev.

537, 565-566 (2011) (when the *Su* prosecutor was deposed in subsequent civil

lawsuit, she explained her non-disclosure of the plea deal resulted from her training

in the QCDAO to erect a "Chinese Wall" in order to avoid obtaining knowledge of

deals with witnesses).  At the very least, Bellamy should be allowed to take

discovery of what took place in the QCDAO in the other cases referenced in the Complaint and link that evidence to the misconduct in his own case.

### D. Municipal Liability Promotes Other Goals That Benefit Our Criminal Justice System

Municipal liability promotes other positive goals. Consistent with tort principles, it fairly redistributes the burden of addressing the harm imposed by a wrongful conviction by requiring all taxpayers to bear a share of the burden rather than the wrongfully convicted to bear the burden alone. *Owen*, 445 U.S. at 655 ("After all, it is the public at large which enjoys the benefits of the government's activities, and it is the public at large which is ultimately responsible for its administration[.] [I]t is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers[.]"). It also fosters our democratic processes by increasing the visibility of unconstitutional practices and better enabling New York taxpayers to hold elected DAs accountable in the next election. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269 (1981) ("[T]he compensatory damages that are available against a municipality may [] induce the public to vote the wrongdoers out of office."); *see, e.g.*, Secret, *Lawsuit Against Prosecutor to Proceed*, N.Y. Times, Feb. 15, 2013 (months before the 2013 Brooklyn DA race, a *Monell* claim by a wrongfully convicted and imprisoned man was allowed to proceed to discovery, "making it probable that testimony

against [incumbent Brooklyn DA] Hynes and his office could come out in the middle of what promises to be a heated campaign"), http://www.nytimes.com/2013/02/16/nyregion/lawsuit-against-charles-j-hynes-brooklyn-district-attorney-is-allowed-to-proceed.html; Sapien, *New York City Will Pay $10 Million to Settle Wrongful Conviction Case*, ProPublica, Aug. 19, 2014 (announcing after DA Hynes lost re-election that the *Monell* claim "expose[d] the illegal practices of [DA] Hynes and [] help[ed] drive him from office"), https://www.propublica.org/article/new-york-city-will-pay-10-million-to-settle-wrongful-conviction-case.

### E.  If Upheld, The District Court's Decision Would All But Eliminate The Last Viable Incentives For DAs To Adopt Local Policies In Accordance With The Constitution

The District Court's decision threatens to eliminate (or, at the very least, substantially limit) municipal liability for prosecutorial misconduct.  Even under this Court's current precedent, *Walker* and *Myers*, few consequences exist for DAs' unconstitutional or deliberately indifferent policy decisions.  If the District Court's decision is affirmed, almost none would remain.

Many convictions stand, even when there is misconduct, because of the "materiality" and "harmless error" appellate standards.  *See Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (*Brady* evidence is "material" if there is a "reasonable probability that, had the information been disclosed to the defense, the result of the

proceeding would have been different" (quotation marks omitted)); *United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004) (prosecutor's improper closing statements did not cause defendant substantial prejudice); *see also* Ridolfi et al., National Ass'n of Crim. Def. Lawyers, *Material Indifference: How Courts Are Impeding Fair Disclosure In Criminal Cases* 15-23 (2014) (study concluding that courts apply materiality standard in arbitrary manner that favors government), https://www.nacdl.org/discoveryreform/materialindifference/.

Even an overturned conviction does not provide sufficient incentive to change constitutionally deficient policy. Many DAs, including the QCDA whose conduct is at issue here, reject and discount judicial determinations of prosecutorial misconduct. *See, e.g.*, Letter from John M. Ryan, Chief Assistant District Attorney, Queens Cty., to Joaquin Sapien, *ProPublica* (Sept. 14, 2012), *available at* https://www.propublica.org/documents/item/654080-pro-publica-response-qda-09-14-12-2 (arguing that "except in the rarest cases," most *Brady* violations are "simply a difference of opinion as to the requirements of law."); Grady Dep. 244:24-245:9, *Bozella v. County of Dutchess*, No. 10-4917 (S.D.N.Y. Jan. 15, 2014), ECF No. 162-50 (Dutchess County DA, William Grady, testifying in §1983 action brought by wrongfully convicted plaintiff that he disagreed with County Court ruling that withheld information was *Brady* material); Rudin, *Errant Prosecutors*, *supra*, at 566 (John Ryan, Queens Chief ADA, comforted the ADA in

*Su v. Filion*, 335 F.3d 119 (2d Cir. 2003), whose *Brady* violation caused a wrongful conviction and 13-year wrongful imprisonment by calling it "'a bad day, that's all'"). The Complaint here crystallizes the point. New York's highest court found the QCDAO's practice of shielding trial prosecutors from knowing the benefits promised to witnesses unconstitutional, but the QCDAO *continued to implement it*. *See Steadman*, 623 N.E.2d at 512; A-89-90 ¶¶ 364-365.

ADAs rarely suffer any consequences from overturned convictions. They are almost never held criminally liable for misconduct. *See* Keenan, *Myth of Prosecutorial Accountability*, *supra*, at 217-218 (criminal sanctions for prosecutors who violate *Brady* are exceedingly rare). They are individually immune from civil liability. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 341-342 (2009). And professional discipline is almost unheard of. *See* N.Y. State Bar Ass'n, *Criminal Discovery*, *supra*, at 64 (New York Bar task force charged with surveying Department Disciplinary Committees across the state for information regarding disciplinary actions or complaints based on *Brady* violations found *not one* public action taken by a Grievance Committee after a *Brady* violation was reported).

While the *Connick* majority presumed that most prosecutors receive adequate training and discipline regarding their constitutional obligations, *see Connick*, 563 U.S. at 66, discovery obtained in prior *Monell* actions against New York City reveals precisely the opposite: several district attorneys, including the

QCDA in 73 different cases, failed to implement additional training or discipline

prosecutors following reversals based on prosecutorial misconduct. *See* Rudin,

*Errant Prosecutors*, *supra*, at 563. Thus, there is strong evidence of a systemic

problem in our prosecutors' offices where courts identify constitutional failures

and municipal policymakers do not take any steps to ensure that misconduct is not

repeated. Powerful incentives are therefore necessary to ensure that municipal

policymakers take such steps to minimize the likelihood that similar misconduct

leads to additional wrongful convictions.

Rather than incentivize constitutionally acceptable conduct by municipal

policymakers, the District Court's decision creates a gaping safe haven for official

misconduct by allowing municipalities making local policy through their DAs to

share in the immunity enjoyed by individual prosecutors. If this Court upholds that

decision, in effect abrogating or overturning *Walker* and *Myers*, municipalities

would be free to adopt law enforcement and prosecutorial policies and practices

without any regard for criminal defendants' constitutional rights. A DA could, for

example, adopt a policy directing his assistants not to disclose *Brady* material at

all, betting on the favorable odds that, even if discovered, the office might win the

case on appeal on the ground that the evidence was not material or its suppression

harmless. No municipality (or individual) would be liable for the DA's decision—

no matter how flagrantly unconstitutional. Yet it is logically indistinguishable

from what the QCDA apparently chose to do here: continuing to implement a "Chinese Wall" policy to avoid *Brady* disclosures regarding its compensated witnesses for years after *Steadman* declared that practice unlawful. *Monell* and its progeny do not, and should not, permit our local government to act with such deliberate indifference to violations of its citizens' constitutional rights.

## II. THE DISTRICT COURT'S DECISION IGNORES NEW YORK STATE POLICY TO DETER MUNICIPALITIES FROM VIOLATING CRIMINAL DEFENDANTS' CONSTITUTIONAL RIGHTS

The Supreme Court has made clear that *Monell* liability is a federal question that *depends on state law*. *McMillian v. Monroe Cty.*, 520 U.S. 781, 786 (1997) (emphasis added). Federal courts must therefore analyze and apply state law in determining whether a local official's acts may fairly be said to represent the official policy of a county or municipality, such that constitutional harms caused by the local policy give rise to *Monell* liability. *See id.* at 784-786. This is because "[s]tates have wide authority to set up their state and local governments as they wish," and "our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *Id.* at 786, 795. This approach respects the federal system rooted in our Constitution and the principles recognized by Supreme Court jurisprudence for over a century. *See id.* at 795; *see also Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907) (states have "absolute discretion" to

create political subdivisions "for exercising [] the governmental powers of the state"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion on *Monell* claim, holding that local governments may give "particular officers [] authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances").

This Court, as the Court of Appeals with jurisdiction in New York, is the federal court with the most expertise interpreting New York state law in the context of a *Monell* claim. *See McMillian*, 520 U.S. at 786-787 ("defer[ring] considerably" to the Eleventh Circuit's analysis of Alabama law on the state and local functions of sheriffs as policymakers). And it has *twice* expounded that, as a matter of New York state law, New York municipalities can be sued for the exact type of policies, practices, and deliberate indifference that caused Bellamy's constitutional injuries. *Walker*, 974 F.2d at 301 (applying New York state law and holding that municipality can be held liable when a DA decides not to supervise or train line prosecutors on *Brady* and perjury issues); *Myers*, 157 F.3d at 76 (analyzing N.Y. Public Officers Law, N.Y. County Law, and other applicable caselaw one year after *McMillian* and holding that "[u]nder New York law,

prosecutors are *generally presumed* to be local county officers, not state officers")

(emphasis added).[8]

    *Myers* and *Walker* thus stand for the proposition that New York has made a

policy decision to hold its municipalities liable for DAs' management of their

offices, even where, as both here and in *Myers*, their policies may relate to trial

activities.  The question is whether the DA acts as a local policymaker in setting

managerial policies, *Myers*, 157 F.d at 76, not whether the policy affects

prosecutorial or trial-related decisions, as policies adopted by DAs almost always

do.

---

[8]    The *Myers* Court reaffirmed its conclusion in *Walker* that this Court's decision in *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988), is only "a narrow exception to this general rule," limited to challenges to "specific decision[s] of the District Attorney to prosecute."  157 F.3d at 77.  This Court has consistently applied the "narrow exception" in *Baez* to the same factual pattern involving a claim based on the DA's allegedly wrongful decision to indict.  *See, e.g.*, 853 F.2d at 77 (Eleventh Amendment barred malicious prosecution claim arising out of a decision to indict.); *Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("[T]o the extent that the complaint alleged that Morgenthau was implicated in Rettler's decision not to bring charges against Thai, Morgenthau was properly deemed to be an official of New York State … .  To the extent that the complaint here alleged that Morgenthau as the District Attorney for New York County had promulgated a policy or custom regarding … face-to-face identifications and the alleged failure to protect [a witness to a crime], Morgenthau may be deemed to be a municipal policymaker for New York City."); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1154 n.14 (2d Cir. 1995) ("as long as a plaintiff's claims center not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, there can be liability against a New York county" (quotation marks and citations omitted)).  This case is not based on such allegation.

The District Court ignored this controlling Second Circuit precedent and sidestepped any analysis of state law. *Compare* SPA-75 *with Myers*, 157 F.3d at 76; *see also Claude H. v. County of Oneida*, 626 N.Y.S.2d 933, 935 (App. Div. 1995) (county liable where DA "directed the police to arrest and detain [plaintiff] without a warrant"); *Morris v. City of New York*, 603 N.Y.S.2d 463, 464-465 (App. Div. 1993) (ADA is a county officer and therefore New York City could be liable for ADA's assault and DA's "negligent hiring, supervision, and retention" of ADA); *Tunia v. State*, 434 N.Y.S.2d 846, 849 (Ct. Cl. 1978) (Court of Claims has no jurisdiction over DA because DA "is a county employee"); *Fonfa v. State*, 388 N.Y.S.2d 65, 68 (Ct. Cl. 1976) (DA is a local officer for whom state is not liable).[9] Indeed, the District Court entirely ignored the only two New York state court decisions that have ruled on this issue, both of which compel reversal here. *See Johnson v. Kings Cty. Dist. Attorney's Office*, 763 N.Y.S.2d 635, 648 (App. Div. 2003) (upholding § 1983 claim against City for DA's failure to train and supervise employees regarding legal obligations, because such management failures correlate with defects in the DA's role as a local policymaker); *Ramos v. City of New York*, 729 N.Y.S.2d 678, 693-694 (App. Div. 2001) (plaintiff adequately pleaded § 1983 claim against City for "deliberately inadequate" policies, adopted through DA, that

---

[9]     The Special Appendix to Appellant's Brief is cited as "SPA-" by page number.

failed to discipline or properly supervise prosecutorial personnel regarding *Brady* obligations and making false or misleading arguments to the jury).

Instead, the District Court misread "the Supreme Court's decision in *Van de Kamp*," 555 U.S. at 345-348, which concerned an entirely different issue of an individual prosecutor's immunity, rather than a municipality's liability, and did not involve New York state law at all. *See* SPA-75; *see also Goldstein v. City of Long Beach*, 715 F.3d 750, 760 (9th Cir. 2013) (the inquiries of prosecutorial immunity and state or local policymaking are separate). It also ignored decades of Supreme Court precedent making clear that individual liability (the issue in *Van de Kamp*) and municipal liability (the issue here) invoke different policy considerations and therefore have different legal standards. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 699 n.32 (1978) (affirming award of attorney's fees payable by state, but noting that imposing personal liability against individual officials may cause officers to exercise their discretion with undue timidity and would be "manifestly unfair"); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 n.29, 406 (1979) (recognizing that justification for immunizing officials from personal liability has little force to a claim against a government entity); *Owen*, 445 U.S. at 654-656 (holding that municipalities do not have a qualified immunity defense because the "'mutually dependent rationales'" for individual immunity

"lose[] [their] force" and are "simply not implicated" when "the damages award comes not from the official's pocket, but from the public treasury").

## CONCLUSION

For the reasons set forth above, *Amici* respectfully request that this Court reverse the judgment of the District Court dismissing Claims 6 and 8 of the Complaint, and reinstate Bellamy's *Monell* claims.

Respectfully submitted,

/s/ Ross E. Firsenbaum

RICHARD D. WILLSTATTER
VICE CHAIR, AMICUS CURIAE
  COMMITTEE OF THE NATIONAL
  ASSOCIATION OF CRIMINAL
  DEFENSE LAWYERS
CHAIR, AMICUS CURIAE COMMITTEE
  OF THE NEW YORK STATE
  ASSOCIATION OF CRIMINAL
  DEFENSE LAWYERS
200 Mamaroneck Avenue, Suite 605
White Plains, NY 10601
(914) 948-5656

ADELE BERNHARD
INNOCENCE NETWORK
185 West Broadway
New York, NY 10013
(212) 431-2813

BARRY SCHECK
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY 10013
(212) 364-5340

ROSS E. FIRSENBAUM
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Amici Curiae*
*National Association of*
*Criminal Defense Lawyers,*
*New York State Association of*
*Criminal Defense Lawyers,*
*Innocence Network, and*
*Innocence Project*

October 2, 2017

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), Fed. R. App. P. 32(a)(7)(B), 2d Cir. R. 29.1(c), and 2d Cir. R. 32.1(a)(4).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,891 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Ross E. Firsenbaum
ROSS E. FIRSENBAUM

October 2, 2017